UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06cr112-MEF |
| | ) | |
| GLENN C. TOUPS | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

Pending before the court is the defendant's ["Toups"] motion to suppress evidence obtained as the result of a search of Toups's apartment home and a contemporaneous interview conducted by the police, which led to his indictment in this case (Docs. # 1, 27). On 26 July 2006, the court conducted a hearing during which the parties submitted documentary evidence and elicited testimony from Margaret Faulkner ["Faulkner"], the special agent with the Federal Bureau of Investigation ["FBI"] who supervised the investigation, search and interview at issue (Doc. # 34).

The only issues for the court to decide are (1) whether the affidavit in support of the warrant to search Toups's apartment established probable cause and (2) whether the circumstances of the interview were unconstitutionally coercive (Doc. # 27).[1]  Having carefully reviewed the evidence and the relevant law, the undersigned concludes that (1) the affidavit was sufficient to establish probable cause; and (2) the interview was not unconstitutionally coercive.  Therefore, the Magistrate Judge recommends that the motion

---

[1]Neither party addresses the good-faith exception to the rule that a search warrant must be supported by probable cause.

be denied.

# I.  DISCUSSION

## A.  Probable Cause

### 1.  Relevant Facts

According to the affidavit in support of Faulkner's search warrant request, on 2 May 2005, Faulkner, who has been employed with the FBI for more than 17 years and is currently the "Crimes Against Children Coordinator for the Middle District of Alabama", received information from fellow agent Phillippe Dubord, who is assigned to the FBI's office in Tampa, Florida (Faulkner Aff., Gov't Ex. 1, ¶¶ 1, 2).  The Tampa agent informed Faulkner that an investigation conducted by his office had led to information linking members of internet service provider America Online ["AOL"] to distribution of child pornography (Gov't Ex. 1, ¶¶ 18-21).  One of the AOL members linked to the images utilized the screen name "nudetooldad." *Id.*

Data obtained from the Tampa suspect's computer and AOL indicated that "nudetooldad" was a former AOL screen name assigned to an account billed to Glenn C. Toups (Gov't Ex. 1, ¶¶ 18-22).  The name on the account was G Toups, and the address matched one later discovered to be the defendant's Montgomery, Alabama, residence. *Id.*[2]

---

[2]Federal law and the court's concern for Toups's privacy compel the court to exclude identifying information such as his full address, date of birth, and Social Security and telephone numbers.  This information is included within the parties' exhibits, which have been ordered sealed (Doc. # 36).

The account was opened on 7 April 2003 (Gov't Ex. 1, ¶ 22), and, as of 19 January 2005, the screen name "nudetooldad" had been deleted from the account and had not been reassigned (Gov't Ex. 1, ¶ 21).

The data also revealed that "nudetooldad" had sent approximately 30 electronic messages with attached "images [that] appeared to be children ranging in age from 2 years to 9 years and who were engaged in sexual activity with adults. Two of the images were recognized as known images, that is images of children who are known to be real children and whose identity [sic] are known" (Gov't Ex. 1, ¶ 28).

Upon receiving the information, Faulkner directed an additional investigation, which included (1) a "[c]omputer search" that identified G. Toups as "Glenn Charles Toups, white male" with an address matching the one provided by AOL (Gov't Ex. 1, ¶ 23); (2) a driver's license check further corroborating the AOL information as well as the information obtained through the electronic search and also providing a date of birth and general physical description of Toups; (3) surveillance of Toups's apartment, which did not result in any additional material information; (4) an interview with the manager of Toups's apartment complex who confirmed that Toups still resided in the apartment and had recently renewed his lease (Gov't Ex. 1, ¶ 26); and (5) interviews with a representative from Toups's employer, who confirmed his employment as well as the identifying information Faulkner had already obtained (Gov't Ex. 1, ¶¶ 24-27).

After reviewing the images that had been attached to the messages from

3

"nudetooldad", and armed with the information linking the Glenn Charles Toups who lived

in Montgomery with the screen name "nudetooldad," Faulkner sought a warrant to search

Toups's apartment and seize property that could possibly be linked to the commission of

crimes defined in 18 U.S.C. §§ 2252(a)(1), 2252A(a)(1) (2000) (Gov't Ex. 1, ¶¶ 3-5, Def. Ex.

1).[3] On 28 July 2005, U.S. Magistrate Judge Susan Russ Walker issued a search warrant, and

Faulkner executed the warrant on 5 August 2005 (Def. Exs. 2, 8).


     **2.    Toups's Arguments**

--------------------------------

   [3]Section 2252(a) prohibits:

> (1) knowingly transport[ing] or ship[ping] in interstate . . . commerce by any means including by computer or mails, any visual depiction, if - -

>> (A) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and
>> (B) such visual depiction is of such conduct;

18 U.S.C. § 2252(a)(1).

   Section 2252A(a) prohibits:

> (1) knowingly mail[ing], or transpor[ing] or ship[ping] in interstate . . . commerce by any means, including by computer, any child pornography.

18 U.S.C. § 2252A(a).

Toups contends that the search warrant was invalid because it was not supported by probable cause. Specifically Toups contends that the information on which the warrant was based was stale (Doc. # 27, p. 7). In addition, he contends that the information did not sufficiently link him with the relevant crime, "which covers possession or receipt or distribution of child pornography with some connection to foreign or interstate commerce." *Id.*

### 3.    Governing Law and Analysis

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. Therefore, "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." *Id.*

An affidavit in support of a warrant "must provide the magistrate with a substantial basis for determining the existence of probable cause . . .." *Illinois v. Gates*, 462 U.S. 213, 239 (1983). "Probable cause deals 'with probabilities. These are not technical; they are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" *Id.* at 241. "The essential protection of the warrant requirement . . . is in 'requiring that [the usual inferences which reasonable men draw from evidence] be drawn by a neutral and detached magistrate instead of being judged by the officer engaged

in the often competitive enterprise of ferreting out crime.'" *Id.* at 240 (quoting *Johnson v. United States*, 333 U.S. 10, 14 (1948)).

"Sufficient information must be presented to the magistrate to allow that official to determine probable cause; his action cannot be a mere ratification of the bare conclusions of others." *Id.* at 239. Nevertheless, "a magistrate judge is only required to answer the 'commonsense, practical question whether there is probable cause to believe that contraband or evidence is located in a particular place' before issuing a search warrant." *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2005) (*en banc*) (quoting *Gates*, 462 U.S. at 230).

Borrowing from several other federal circuit courts of appeal, the Eleventh Circuit Court of Appeals has established the following standard for determining whether the affidavit contains the "critical" information necessary "to establish a finding of probable cause." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

> "It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched." *United States v. Hove*, 848 F.2d 137, 140 (9th Cir. 1988) (As "the affidavit offer[ed] no hint as to why the police wanted to search [the] residence" and why they believed they would find incriminating evidence there and there was no link between the location and the defendant, any official belief that the warrant established probable cause was unreasonable.). "The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business." *United States v. Procopio*, 88 F.3d 21, 28 (1st Cir. 1996). Thus, the affidavit must contain "sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched." [*United States v.*]*Pigrum*, 922 F.2d [249,] at 253

6

[(5th Cir. 1991)].

Specifically, the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and criminal activity. *See* **United States v. Marion**, 238 F.3d 965, 969 (8th Cir. 2001).

**Martin**, 297 F.3d at 1314.[4]

Toups's contention that the affidavit failed to link him or his residence sufficiently to the interstate distribution of sexually explicit images involving the use and depiction of minors is meritless. The affidavit, which need not remove all doubt about his or his residence's involvement in the crimes alleged,[5] clearly and methodically implicated both the defendant and his residence in the cross-border electronic transmission of at least 30 images depicting young children engaged in sexual acts (Gov't Ex. 1).

Toups relies on the fact that the images were allegedly sent approximately ten months before the search warrant was executed and contends, therefore, that the information forming the basis for the warrant application was stale.[6] As Toups notes, "[t]he information in the affidavit must also be fresh." **Martin**, 297 F.3d at 1314 (citing **United States v.**

---

[4]Although the good-faith exception is not at issue in the instant case, it bears mentioning that the Court of Appeals in **Martin** found that the affidavit in support of the search warrant "contain[ed] enough indicia of probable cause" to render reliance on the warrant "not entirely unreasonable" despite the fact that "[t]he affidavit [did] not specifically link [the defendant] with either the criminal activity or the residence." *Id.* at 1315.

[5]*See e.g.* **United States v. Weaver**, 145 Fed. Appx. 639 (11th Cir. 2005).

[6]A time stamp on the electronic messages indicates that they were sent on 6 October 2004 (Def. Ex. 6).

*Zimmerman*, 277 F.3d 426, 437 (3d Cir. 2002)).

It is important to note initially that *Martin* did not involve electronically formatted, sexually explicit images depicting children, a particular facet that other circuits have found to justify a delayed search based on information that in different circumstances may have been considered stale. *See* *United States v. Wagers*, 452 F.3d 534, 538-40 (6th Cir. 2006) (upholding a search conducted at least eight months after the defendant was suspected of having obtained child pornography and stating that its "opinion . . . is consistent with the views of . . . [t]he Second and Fifth Circuits, . . . [which] have noted that evidence that a person has visited or subscribed to websites containing child pornography supports the conclusion that he has likely downloaded, kept, and otherwise possessed the material"); *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) ("When a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes." (internal quotations/citations omitted)); *cf.* *Gourde*, 440 F.3d at 1072 (upholding a finding of probable cause based in part on "[t]he details provided on the use of computers by child pornographers").

Faulkner explained in her affidavit that her training and experience has led her to understand that

> [t]he majority of individuals who collect child pornography . . . are persons who have a sexual attraction to children. They receive sexual gratification and satisfaction from sexual fantasies fueled by depiction of children that are sexual in

8

nature.

. . . Individuals whose sexual objects are minors commonly collect and save child pornography as representations of their sexual fantasies. These include explicit reproductions of a child's image, voice, or handwriting, and they include computer image files, photographs, negatives, magazines, motion pictures, video tapes, books, slides, audiotapes, handwritten notes, drawings or other visual media.

. . . Individuals who collect child pornography usually keep and cherish it and they rarely throw it away. They typically keep it for many years, and will not be without it for long periods of time. These materials are usually maintained in a secure place, most often a residence, to avoid detection by law enforcement.

. . . Individuals who collect child pornography often correspond or meet others to share information and material, rarely destroy correspondence from other child pornographers, conceal such correspondence as they do their sexually explicit material and often maintain lists of names, addresses, telephone numbers and screen names of individuals with whom they have been in contact and who share the same interests in child pornography.

(Gov't Ex. 1, ¶¶ 29-31, 33).

Thus, "[i]t neither strains logic nor defies common sense to conclude, based on the totality of these circumstances, that someone who [distributed at least 30 images containing child pornography] probably had viewed or downloaded such images onto his computer." *Gourde*, 440 F.3d at 1071. Furthermore, it is commonly understood that information stored on a computer is difficult to eliminate entirely from the computer's hard drive and can be retrieved even after the user has "deleted" the particular file.[7] *See*, *e.g.*, *United States v.*

---

[7]Faulkner failed to include in her affidavit the date that the images were apparently sent (Def. Ex. 6). Regardless, considering the information Faulkner provided concerning the behavior of

9

*Eberle*, No. CRIM. 05-26 ERIE, 2006 WL 1705143, at *2 (W.D. Pa. June 15, 2006) (quoting

testimony from a computer expert regarding the effect of deleting a computer file); *United*

*States v. Fazio*, 1:05CR00014ERW(LMB), 2006 WL 1307614, at *9 (E.D. Mo. May 9,

2006) (relying on an affidavit from a case agent explaining that "[w]hen a person deletes a

file on a home computer, the data remains on the hard drive until it is overwritten by new

data").

      For legal support, Toups relies on *Zimmerman*, which is materially distinguishable

from the instant case. First, the parties in *Zimmerman* conceded that the police did not have

probable cause to search the defendant's residence for child pornography because the police

had evidence only that he had made sexual advances to children and had shown them *adult*

pornography. 277 F.3d at 432.

      Rather than abandon the issue altogether, however, the Third Circuit hypothesized in

*dicta* that it "most likely" would not have accorded much weight to a postal inspector's

statement similar to Faulkner's regarding the proclivities of collectors of child pornography.

*Id.* at 433 n.4. While the *Zimmerman* court's conclusion suggests a parallel with the instant

case, the Third Circuit's stated rationale exposes the similarity as a mirage: "[T]here [was]

nothing in [the postal inspector's] statement indicating that [he] knew anything about [the

---

collectors of child pornography as well as the information regarding the Tampa investigation, Judge
Walker could reasonably have inferred (1) that Faulkner had received the information from the
Florida agents in fairly close temporal proximity to the recovery of the images from the Florida
computer; and (2) that the recent recovery of the images from the Tampa recipient's computer
established, or at least strengthened, the inference that the sender would still possess the images as
well.

defendant] or what the investigation had disclosed." *Id.* at 433 n.4.   Thus, the relevant

circumstances in ***Zimmerman*** stand in stark contrast to those before the court in the instant

case, where the authorizing judge received the behavioral insight directly from the case

agent, who also disclosed her experience investigating sex crimes involving children as well

as her familiarity with the pertinent investigation (Gov't Ex. 1, ¶¶ 1,18-28).

Toups is correct that the ***Zimmerman*** court concluded that evidence that the defendant

had possessed one piece of adult pornography was stale six months later (Doc. # 27, p. 7).

277 F.3d at 433-36.  Conveniently however, Toups fails to mention that in so doing, the

court, in a fashion arguably inconsistent with its view of the postal inspector's opinion,

distinguished the facts before it from a case involving child pornography in which it had

noted

> the fact that pedophiles rarely, if ever, dispose of child
> pornography.  Many courts have similarly accorded weight to
> that fact.  *See, e.g.*, ***United States v. Lacy***, 119 F.3d 742, 746
> (9th Cir. 1997); ***United States v. Peden***, 891 F.2d 514, 518-19
> (5th Cir. 1989). <u>*Presumably*</u> *individuals will protect and retain*
> *child pornography for* <u>*long periods of time*</u> *because it is illegal*
> *and difficult to obtain*.

277 F.3d at 434 (discussing ***United States v. Harvey***, 2 F.3d 1318, 1322 (3d Cir. 1993))

(emphasis added).

In determining that probable cause existed to support a search warrant, Judge Walker

reasonably "made a 'practical, common-sense decision' that there was a 'fair probability' that

child pornography would be found on [Toups's] computer," which is all the Fourth

Amendment requires. *Gourde*, 440 F.3d at 1066; *see also* **United States v. Guthrie**, No. 05-8113, 2006 WL 1689290, at *4 (10th Cir. June 21, 2006) (describing a search warrant affidavit establishing that child pornography had been linked to a computer at the defendants' residence as "overwhelmingly sufficient to establish probable cause").

**B.    *Coerciveness of the Interview***

**1.    Relevant Facts**

Shortly after receiving the search warrant, Faulkner executed it in the company of between five and seven law enforcement officers, each of them with their weapons holstered and wearing a bullet-proof vest or "raid jacket" bearing law enforcement insignia (Hearing Transcript ["Tr."] at 15, 41).[8]  When the officers arrived at Toups's apartment at 9:00 a.m. on Wednesday, 5 August 2005, Faulkner knocked on the door, and Toups, who was alone, answered (Tr. at 15, 39-40).

Faulkner identified herself and the others and explained that they "had a search warrant for his house and the search warrant was referring to child pornography, and that [they] would like to come in" (Tr. at 15-16).  About five to ten minutes after entering Toups's apartment, Faulkner and another officer approached Toups to interview him while the others separated and began searching in their pre-assigned areas (Tr. at 42-43, 45).  The

---

[8]Faulkner identified those who accompanied her as "Lieutenant Mann, . . . Jeff Arney with the postal service, Mary Griffin with Montgomery County, Jeff Croake, who is another agent that was assigned here in Montgomery. . . .[,] Tyler McCurdy, who is also an agent here, . . ..  There might have been one or two more."  (Tr. at 15).

following exchange between Faulkner and Assistant United States Attorney Karl David

Cooke, Jr., Esq., at the evidentiary hearing details the circumstances of the interview, which

lasted approximately one hour:

> A.    He was very cooperative.  We asked him to step outside his door before we entered and we - - in doing that we asked him - - told him we were going to pat him down for a weapon just for our safety and his safety.  We did that.  We walked into the apartment.  We asked him - - you know, we told him he was not under arrest, but that we would - - he could leave any time if he wished but we would like to talk with him about our search warrant and the information that we had, and would he be willing to talk with us.

> Q.    Now, any doubt in your mind about you telling him that he was not under arrest or that he was free to leave?

> A.    No, sir, no doubt.

> Q.    Did he appear afraid or nervous when you told him these things?

> A.    No, sir.

> Q.    When you were speaking with him did you - - after patting him down did you limit his movement in any way, such as you sit here or don't go there or anything of that nature?

> A.    No.  We asked him where he would prefer to sit since he agreed to talk with us and he chose on the balcony as a good place to sit and so we went out there and sat with him.

> Q.    Now, earlier I may have made a mistake when I wrote down that there were *Miranda* warnings given. [C]an you tell us whether or not he was given *Miranda*?

A.     No, sir, he was not mirandized.

Q.     Now, can you explain to us why he was not given *Miranda* warnings?

A.     Because he was not under arrest and he was free to leave.

Q.     Now, earlier you testified that Mr. Toups agreed to talk with you and that you told - - you asked him to choose where he would like for the interview to take place. Where did he lead you?

A.     To the balcony.

Q.     And who came to the balcony?

A.     Mr. Toups and myself and Lieutenant Mann.

Q.     Okay.  When you got to the balcony did y'all stand, sit, how did - -

A.     We sat.

Q.     You sat?

A.     We sat.

Q.     Was there a table, chairs, bench, what was there?

A.     It was chairs, and basically he was sitting on one side of the balcony with his back to the balcony facing inside and myself and J.R. Mann, Lieutenant Mann were sitting like across from him with our backs to the balcony facing inside also.  So there was no one sitting between him and the door is what I am getting at.

Q.     Once you sat down with him what happened?

A.     He proceeded to talk with us and admit that he had child pornography and that he had a problem with child

14

pornography and that he was aware of his problem.

Q.    Was he at all hesitant in admitting that he did possess child pornography?

A.    No, sir.  He was very cooperative.  He cooperated freely and fully and with no hesitation.

Q.    Was there any kind of evasiveness at all that he demonstrated?

A.    No, sir.

Q.    Did he at any time while you were sitting there on the balcony appear to be nervous or afraid of you or anything - - or anyone there?

A.    No, sir.  He - - you know, I am sure that he was nervous about what was going on, but as far as talking with us or anything, I didn't see any nervousness in the sense that he was afraid to talk with us or anything like that.

Q.    Did he at any time say to you, you know what, I don't want to talk anymore, can we just stop this?  Did he ever say anything like that?

A.    No, sir, he didn't.

(Tr. 16-19, 45).

Nor did Toups request an attorney during the three-hour search of his apartment and, immediately following, his automobile (Tr. 19-20).  During the interview, Toups's wife arrived at the apartment and joined her husband and the officers on the balcony for the remaining 35 to 40 minutes of the interview (Tr. 45 to 46).

Toups's cooperation, which continued after the searches and interview had concluded,

15

led Faulkner to issue him a summons to appear in court rather than arrest him (Tr. at 21).

Thereafter, Toups continued to cooperate and "contacted [Faulkner] on several occasions

about what he needed to do" (Tr. at 21).

### 2.    Toups's Arguments

Toups contends that the circumstances of the interview amounted to a custodial

interrogation and that, therefore, he was entitled to be informed of his rights pursuant to the

U.S. Supreme Court's ruling in *Miranda v. Arizona*, 384 U.S. 436 (1966).

### 3.    Governing Law and Analysis

"No person shall be . . . compelled in any criminal case to be a witness against

himself. . .." U.S. CONST. amend. V.

> [T]he prosecution may not use statements, whether exculpatory
> or inculpatory, stemming from custodial interrogation of the
> defendant unless it demonstrates the use of procedural
> safeguards effective to secure the privilege against self
> incrimination. By custodial interrogation, we mean questioning
> initiated by law enforcement officers after a person has been
> taken into custody or otherwise deprived of his freedom of
> action in any significant way.

*Miranda*, 384 U.S. 436 at 444.

> It is by now undisputed that the right to *Miranda* warnings
> attaches when custodial interrogation begins. *United States v.
> Acosta*, 363 F.3d 1141, 1148 (11th Cir. 2004). A defendant is
> in custody for the purposes of *Miranda* when there has been a
> "formal arrest or restraint on freedom of movement of the

degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (quotation marks omitted); *see also United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001). Whether [a person is] in custody prior to [a] formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such extent that he would not feel free to leave." *McDowell*, 250 F.3d at 1362 (quotation marks and alterations omitted). "The test is objective: the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996). "[U]nder the objective standard, the reasonable person from whose perspective 'custody' is defined is a reasonable *innocent* person." *Id.*

. . . [T]he fact that an individual is told he is not under arrest and is free to leave is a fact of substantial importance in determining whether a reasonable person would have felt free to leave. . . . Unambiguously advising a defendant that he is free to leave and is not custody . . . generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are "so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview." *Id.* [*United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000)].

*United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (holding that the defendant was not in custody during an interview conducted by police in his home after informing him that he could leave anytime, though the police had confiscated his shoes) (emphasis in original; parallel citations omitted).

In fact, in *Muegge*, the Court of Appeals concluded that an innocent individual "told directly he might leave, in the absence of evidence to the contrary" is not in custody "as a matter of law." 225 F.3d at 1271.

The totality of the circumstances in this case lead to the conclusion that a reasonable, innocent person would have felt free to leave. Most significantly, Toups was informed that he was not under arrest and that he was free to leave at any time (Tr. at 16-17). In addition, the interview occurred in the familiar setting of his own home. *See **Brown***, 441 F.3d at 1348 (quoting ***United States v. Ritchie***, 35 F.3d 1477, 1485 (10th Cir. 1994) for the proposition that "[c]ourts are *much less likely* to find the circumstances custodial when the interrogation occurs in familiar or at least neutral surroundings, such as the suspect's home" (emphasis in original; internal quotations omitted)). Moreover, the interviewers allowed Toups to select the location of the interview; they sat in such a way so as not to impede his access to the door should he desire to leave; and they allowed his wife to join them during the interview (Tr. at 45-46).

These circumstances simply do not suggest the existence of "excessive restraints," which Toups must establish "in order to overcome a finding that under these circumstances a reasonable person would have understood he was free to leave or terminate the interview at any time." ***Brown***, 441 F.3d at 1349. On the contrary, the remarkable extent of Toups's cooperation, which included telephone calls to Faulkner for advice and instructions, belie any notion that the atmosphere in Toups's apartment during the search was restraining.

To be sure, under different circumstances, the presence of eight armed police officers in a small apartment *could* be considered to have imposed an excessive restraint. In this case, however, the evidence is that the officers who accompanied Faulkner, with the exception of

18

the officer assisting her with the interview, were carrying out assigned, search-related tasks in different parts of the apartment, and the evidence before the court does not suggest that anyone attempted to intimidate Toups or restrain his movements in any way.

## II.    CONCLUSION

Therefore, it is the RECOMMENDATION of the Magistrate Judge that Toups's motion to suppress be DENIED.  It is further,

ORDERED that the parties are DIRECTED to file any objections to the said Recommendation on or before 18 August, 2006.  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation objected to.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a *de novo* determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  ***Nettles v. Wainwright***, 677 F.2d 404 (5th Cir. 1982).  *See **Stein v. Reynolds Securities, Inc.***, 667 F.2d 33 (11th Cir. 1982).  *See also **Bonner v. City of Prichard***, 661 F.2d 1206 (11th Cir. 1981) (*en banc*) (adopting as binding precedent all of the

decisions of the former Fifth Circuit handed down prior to the close of business on 30 September 1981).

DONE this 9th day of August, 2006.


/s/ Vanzetta Penn McPherson
VANZETTA PENN MCPHERSON
UNITED   STATES   MAGISTRATE   JUDGE