IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CASE NO. 2:06-cr-112-MEF |
| | ) | (WO - Not Intended for Publication) |
| GLENN CHARLES TOUPS | ) | |

## MEMORANDUM OPINION AND O R D E R

### INTRODUCTION

This cause is before the Court on the Motion to Suppress (Doc. # 27) filed by Defendant Glenn Charles Toups ("Toups"). The Court has carefully reviewed the Motion to Suppress, the transcript of the July 26, 2006 suppression hearing (Doc. # 35) and the exhibits filed therein, the Recommendation of the Magistrate Judge (Doc. # 37), and Defendant's Objections to Recommendation of Magistrate Judge Regarding Motion to Suppress (Doc. # 38). It is the judgment of the Court that the Motion to Suppress (Doc. # 27) is due to be DENIED, the Recommendation of the Magistrate Judge (Doc. # 37) is due to be ADOPTED, and the Defendant's Objections (Doc. # 38) are due to be OVERRULED.

### FACTS

The investigation into Toups began prior to January, 2005 in Florida when the Hillsborough County Sheriffs Office served a search warrant on Gabriel Beltram ("Beltram"), a Tampa resident suspected of trading images of child pornography. Beltram admitted to local investigators that he had traded images of child pornography over the

internet and the information was passed on to the FBI office in Tampa.

Reviewing the forensic evidence obtained from Beltram's computer, the Tampa FBI discovered that Beltram had, through his email, sent and received suspected images and videos of child pornography with numerous America On Line ("AOL") members. One of the AOL screen names with whom Beltram had traded email attachments of suspected child pornography was "nudetooldad." Approximately 30 e-mail messages from "nudetooldad" were found on Beltram's computer.

A subpoena revealed that the screen name "nudetooldad" had once been assigned to AOL account number 0440305146.[1] A separate account summary supplied by AOL in response to the subpoena listed account 0440305146 as belonging to a "G. Toups, 3580 McGehee P S, 4521, Montgomery, AL 361111 US." Further down on the same account summary, the billing reference was "Glenn C Toups."

The Tampa FBI alerted Special Agent Margaret L. Faulkner ("Faulkner"), who was the Crimes Against Children Coordinator for the Middle District of Alabama and a seventeen-year veteran of the FBI.[2] The following steps were taken to confirm the information:

---

[1] According to AOL's fraud investigator, "nudetooldad" was deleted by member 0440305146 and had not yet been reassigned to another account. The account summary revealed, however, that account 0440305146 had several screen names still active: gtoups8, submisssnglmom, and lisa12sexy. "Nudetooldad" was registered to member 0440305146 from April 7, 2003 until January 19, 2005.

[2] Prior to her tenure with the FBI, Faulkner spent over ten years with the Montgomery Police Department. For five of those years, Faulkner investigated child sex crimes.

 (1) Computer searches for "G. Toups." These searches, which were run through various databases, identified a "Glenn Charles Toups, white male," residing at the same address as contained in the AOL account summary. Also revealed were Toups's birth date and social security number.

 (2) Alabama Drivers license search which, as the Magistrate Judge observed, "corroborat[ed] the AOL information as well as the information obtained through the electronic search and also provid[ed] a date of birth and general physical description." Doc. 37

 (3) Surveillance of Toups's apartment, which, though providing no additional material information, confirmed the address.

 (4) Interview with the manager of Toups's apartment complex. The manager confirmed that Toups still resided at that address and Toups had recently renewed his lease.

 (5) Interview with Toups's employer, Regions Bank.

Armed with this information, Faulkner sought a search warrant. In her affidavit dated July 28, 2005, Faulkner asserted that she had probable cause to suspect violations of 18 U.S.C. §§ 2252 and 2252A and that the "instrumentalities of such violations, and any fruits of the crime" could be located at "3850 McGhee Place Drive South, Apartment 4521-B, Montgomery, AL 36111." The resulting search warrant, signed by U.S. Magistrate Judge Susan Russ Walker, listed the address of the property as it was stated in Faulkner's attached affidavit. The warrant was accurate in all respects except for the fact that Toups's apartment was actually located at 3580 McGhee Place Drive South and not 3850 McGhee Place Drive South.

At nine in the morning on August 5, 2005, Faulkner executed the search warrant in the company of several other officers. The officers, including representatives from the FBI, the

U.S. Postal Service and local Montgomery police, had their weapons visible (but holstered) and wore insignia-laden raid-jackets that "easily identified [them] as law enforcement." Doc. 35 at 41 (hearing transcript). Toups, who was alone in the apartment, answered the door. Faulkner "advised him who [the officers] were" and told Toups "that [they] had a search warrant for his house and the search warrant was referring to child pornography, and that [they] would like to come in." *Id.* at 15-16.

As the officers and agents fanned out throughout the apartment and collected and recorded evidence, Faulkner and another officer approached Toups with the intention of interviewing him. As Faulkner testified, "we told him he was not under arrest ... he could leave any time if he wished but we would like to talk with him about our search warrant and the information that we had, and [we asked him] would he be willing to talk with us." *Id.* at 16-17. Faulkner asked Toups "where he would prefer to sit" and Toups ultimately chose the balcony. Faulkner, the other officer, and Toups headed out to the balcony and sat down on the chairs already out there. During the course of the interview, which Toups's wife joined for the remaining portion, Toups had an unobstructed route to the balcony door.

Toups "cooperated freely and fully and with no hesitation"[3] and ultimately revealed

---

[3] Doc. 35 at 18. Faulkner did not notice any nervousness: "I am sure that he was nervous about what was going on, but as far as talking with us or anything, I didn't see any nervousness in the sense that he was afraid to talk with us or anything like that." *Id.* at 19. At no time during the interview, or during the roughly three-hour search of the apartment, did Toups ever request an attorney.

to the officers that he possessed child pornography.[4] Toups further cooperated with the investigators by signing a consent form to search his vehicle. Toups was not placed under arrest and was instead sent a summons to appear in court.

## DISCUSSION

The objections Toups filed to the detailed and comprehensive Recommendation of the Magistrate Judge (Doc. # 37) fall into two main categories. The first set of objections focus on whether there was probable cause for the issuance of the warrant to search Toups's apartment home. The next set of objections center around the interview of Toups during the search of his apartment and whether the interview was coercive and amounted to custodial interrogation. The Court will address the substance of these objections in turn.

*1.    The Search Warrant*

The warrant requirement in the Fourth Amendment to the United States Constitution commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized."  U.S. Const. amend. IV.   The probable cause standard is a "'practical, nontechnical conception' that deals with 'the factual and practical considerations of everyday

---

[4] Faulkner testified that Toups "proceeded to talk with us and admit that he had child pornography and that he had a problem with child pornography and that he was aware of the problem." Doc. 35 at 18. Indeed, when Faulkner showed some of the email attachments containing suspected child pornography, Toups "looked at all of them and ... out of the 30, 25 or so he recognized ... he initialed as recognizing them as images that he had on his computer or had seen." *Id.* at 20.

5

life on which reasonable and prudent men, not legal technicians, act.'" *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (quoting *Illinois v. Gates*, 462 U.S. 213, 231 (1983). It "is a fluid concept -- turning on the assessment of probabilities in particular factual contexts -- not readily, or even usefully, reduced to a neat set of legal rules." *Id.* at 370-71 (quoting *Gates*, 462 U.S. at 232).

For a judge to make a finding of probable cause, "sufficient evidence" must be presented. *Gates*, 462 U.S. at 239. In other words, the action of a judge "cannot be a mere ratification of the bare conclusions of others." *Id.* The Eleventh Circuit has elucidated a standard for determining whether an affidavit submitted in support of a warrant contains the information necessary "to establish a finding of probable cause." *United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002).

> It is critical to a showing of probable cause that the affidavit state facts sufficient to justify a conclusion that evidence or contraband will probably be found at the premises to be searched. The focus in a warrant application is usually on whether the suspect committed a crime and whether evidence of the crime is to be found at his home or business. Thus, the affidavit must contain sufficient information to conclude that a fair probability existed that seizable evidence would be found in the place sought to be searched.

*Id.* (internal citations and quotations omitted). In addition, the Eleventh Circuit requires that "the affidavit should establish a connection between the defendant and the residence to be searched and a link between the residence and any criminal activity." *Id.* The information supplied in the affidavit must also be fresh. *Id.*

The issue of fresh information presents unique challenges in a case involving child pornography. There is little law to this effect in the Eleventh Circuit, but it is important to note that *Martin*, the leading Eleventh Circuit holding that "[t]he information in the affidavit must also be fresh," did not involve child pornography. As Magistrate Judge McPherson wrote, the involvement of "electronically formatted, sexually explicit imagines depicting children ... [is] a particular facet that other circuits have found to justify a delayed search based on information that in different circumstances may have been considered stale." Doc. 37 at 8. For example, where the Sixth Circuit upheld a search conducted over eight months after a defendant was suspected of obtaining child pornography, the court stated that its "opinion ... is consistent with the views of ... [t]he Second and Fifth Circuits, ... [which] have noted that evidence that a person has visited or subscribed to websites containing child pornography supports the conclusion that he has likely downloaded, kept, and otherwise possessed the material." *United States v. Wagers*, 452 F.3d 534, 540 (6th Cir. 2006); *see also United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) ("When a defendant is suspected of possessing child pornography, the staleness determination is unique because it is well known that images of child pornography are likely to be hoarded by persons interested in those materials in the privacy of their homes.") (internal quotations and citations omitted).

Further bolstering the conclusion that the staleness calculation is unique when it comes to cases of internet child pornography is the images and videos stored on a computer are not easily eliminated from a computer's hard drive. The mere deletion of a particular file

7

does not necessarily mean that the file cannot later be retrieved. *See, e.g.*, *United States v. Eberle*, No. CRIM. 05-26, 2006 WL 1705143, at *1 (W.D. Pa. June 15, 2006) (noting that even when a computer has been "wiped," where "all files and data associated with a prior user from a hard drive [are deleted]," the data may still be retrieved through forensic procedures); *United States v. Fazio*, 1:05CR00014ERW(LMB), 2006 WL 1307614, at *9 (E.D. Mo. May 9, 2006) ("Even when ... files have been 'deleted,' they are not really permanently removed from the computer but can be recovered months or years later.") .

In this case, Faulkner's affidavit contained the "critical" information necessary "to establish a finding of probable cause." *See Martin*, 297 F.3d at 1314. Given the discovery of computer images on Beltram's computer attributable to "nudetooldad" and the subsequent subpeona of the AOL records linking "nudetooldad" to Toups, there was "sufficient information to conclude that a fair probability existed that seizable evidence would be found" at Toups's apartment. *See id.* Further, given that the AOL account summary listed Toups's address, it was safe to assume that the apartment was the scene of the illicit activity. Probable cause requires only that the affidavit in support of the warrant show a "fair probability" that seizable evidence would be found at Toups's apartment. Probable cause does not require a legally sufficient showing or a showing to a definite certainty.

Further, the information in the affidavit was not stale because it involved child pornography. Toups cites a case from the Third Circuit, *United States v. Zimmerman*, 277 F.3d 426 (3d Cir. 2002), for the proposition that where evidence exists showing that a

defendant had possessed one piece of adult pornography, such evidence becomes stale after only six months. However, *Zimmerman* is inapplicable here because, as Magistrate Judge McPherson noted in her Recommendation, the Third Circuit in *Zimmerman* distinguished adult and child pornography. *See Zimmerman*, 277 F.3d at 434. Child pornography involves a completely different factual scenario because "pedophiles rarely, if ever, dispose of child pornography." *Id.* Thus, the normal time frame for information becoming stale in an affidavit in support of a warrant changes with allegations of child pornography, because "individuals will [presumably] protect and retain child pornography for long periods of time because it is illegal and difficult to obtain." *Id.*

Toups's AOL account had been active since April 7, 2003 and Faulkner's affidavit was signed on July 2005. Even assuming that all of the images were sent from the screen name "nudetooldad" at the beginning of Toups's tenure with AOL, the information was, at most, 2 years old. Given the peculiar nature of child pornography, this information is not stale. It was highly likely that Toups's still had the images on his computer and had not deleted them. Additionally, had Toups deleted the images, it was also possible that the images could still be recovered from the depths of his computer's hard drive.

As an addendum, it is also necessary to address Toups's lead objection-- though certainly not his strongest--that the Recommendation of the Magistrate Judge failed to discuss the issue of the wrong street number on the search warrant. The government is correct here in characterizing this slip as a "clerical error" since the rest of the warrant and

the rest of the address are listed with adequate specificity. In the Eleventh Circuit, the "Fourth Amendment requires only that the search warrant describe the premises in such a way that the searching officer may 'with reasonable effort ascertain and identify the place intended.'" *United States v. Burke*, 784 F.2d 1090, 1092 (11th Cir. 1986) (quoting *United States v. Weinstein*, 762 F.2d 1522, 1532 (11th Cir. 1985). Therefore, the fact that the digits in the street number were transposed incorrectly is of no consequence to the validity of the warrant itself. Given the specificity of the address and the fact that the address clearly referred to a multi-unit apartment complex, it is unlikely that any searching officers would be thrown off the trail. Furthermore, the FBI had already conducted surveillance of Toups's apartment and even spoken with the manager of the apartment complex to confirm that Toups still lived there. The search warrant clearly described the premises in such a way that a searching officer could with reasonable effort ascertain and identify the place intended.

   *2.   The Interview*

A defendant's right to Miranda warnings "attaches when custodial interrogation begins." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006). Whether custody has ensued depends on whether the defendant has been formally arrested or if a restraint placed on his or her "freedom of movement of the degree associated with formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983). The determination of "custody" prior to formal arrest "depends on whether under the totality of the circumstances, a reasonable man in his position would feel a restraint on his freedom of movement to such an extent that he

would not feel free to leave." *United States v. McDowell*, 250 F.3d 1354, 1362 (11th Cir. 2001) (internal quotations and citations omitted). The test for determining custody is an objective one. *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996) ("[T]he actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant.").

Where a defendant is told that he or she is not under arrest and therefore free to leave, this is a "fact of substantial importance in determining whether a reasonable person would have felt free to leave." *Brown*, 441 F.3d at 1347. "Unambiguously advising a defendant that he is free to leave and is not in custody ... generally will lead to the conclusion that the defendant is *not* in custody absent a finding of restraints that are 'so extensive that telling the suspect he was free to leave could not cure the custodial aspect of the interview.'" *Id.* (quoting *United States v. Muegge*, 225 F.3d 1267, 1271 (11th Cir. 2000). For example, the Eleventh Circuit found that a defendant was not in custody when he was interviewed at home by the police and repeatedly told he could leave at anytime. *Brown*, 441 F.3d at 1347. Even though the police had confiscated the defendant's shoes, the Eleventh Circuit found that this fact fell "far short of evidence of 'extensive' restraints." *Id.* at 1349 ("While Brown was not free to wear his sneakers, he did have other options (albiet imperfect ones) for leaving the house.").

Given that Toups was never restrained, told he was not under arrest and free to go, and even offered the choice of where to talk with Faulkner and the other officer, it is the

conclusion of this Court that under the totality of the circumstances, Toups was not "in custody" at the time of the interview. Toups has offered no evidence to suggest otherwise. Because Toups was not in custody at the time of the interview, the interview did not amount to a custodial interrogation. Since no custodial interrogation took place, the absence of a Miranda warning is irrelevant and the statements are admissible.

## CONCLUSION

Based on the foregoing, and after an independent review of the file, it is the ORDER, JUDGMENT and DECREE of the Court as follows:

(1) The Recommendation of the Magistrate Judge entered on August 9, 2006 (Doc. # 37) is ADOPTED as set out in this Memorandum Opinion and Order.

(2) The objections to the Recommendation of the Magistrate Judge (Docs. # 38) are OVERRULED;

(3) The Motion to Suppress (Doc. # 27) is DENIED.

DONE this the 6th day of February, 2007

/s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE